**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| MACREGEN, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | 1:19CV591 |
| | ) | |
| W. NEAL BURNETTE III, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Plaintiff MacRegen, Inc.'s Motion to

Dismiss Defendant's Counterclaims [Doc. #24].  Defendant W. Neal Burnette III

("Burnette") alleges that he "provided valuable and specialized services to

MacRegen without receiving due compensation" and asserts claims for breach of

contract, quantum meruit, negligent misrepresentation, and fraudulent

misrepresentation. (See generally Countercls. [Doc. #19].)  MacRegen, Inc.

("MacRegen") challenges the sufficiency of the allegations of each claim and

argues that the economic loss rule bars the tort claims. (See generally Mem. of

Law in Supp. of Pl.'s Mot. to Dismiss Def.'s Countercls. ("Mem. in Supp.") [Doc.

#25].)  For the reasons explained below, the motion is granted.

I.

For purposes of a motion to dismiss, the facts alleged in the counterclaims

are construed in the light most favorable to the counterclaim-plaintiff and all

reasonable inferences are drawn in his favor. See U.S. ex rel. Oberg v. Pa. Higher

Educ. Assistance Agency, 745 F.3d 131, 136 (4th Cir. 2014).  "Burnette is a

distinguished executive and researcher in the pharmaceutical industry, academia, and the United States armed forces, amassing decades of experience and accolades." (Countercls. ¶ 7.) "MacRegen is an early-stage biopharmaceutical company developing treatments for ophthalmological diseases including macular degeneration." (Id. ¶ 9.) MacRegen recruited Burnette to work as a consultant, and he began work in 2014. (Id. ¶¶ 8, 10-11.) Not yet having executed a written consulting agreement ("Consulting Agreement"), Burnette did so in July 2015. (Id. ¶¶ 11-12.) This Consulting Agreement included an exhibit entitled "Project Assignment #___ Under Consulting Agreement" ("Project Assignment") according to which Burnette was to "perform certain services in exchange for 150,000 common shares of MacRegen's stock". (Id. ¶¶ 12, 14.) These services listed in the Project Assignment "merely reflected work that he had already done" in the preceding year. (Id. ¶ 24.)

After Burnette performed the services in the Project Assignment, he was given new assignments that were more substantive and time-intensive. (Id. ¶ 15.) "Among other tasks, Dr. Burnette developed business plans, created and revised executive summaries and presentations for prospective investors, reviewed scientific research and data, devised research and development strategy, evaluated scientific agreements and patents, conducted business and scientific meetings, and provided guidance and oversight for MacRegen's executives" as "MacRegen sought to use Dr. Burnette to assist in raising investment capital." (Id. ¶¶ 16, 27.) These new project assignments were not in writing, but Burnette "was told by

2

representatives of MacRegen that, with each new task and assignment, he would

be compensated in accordance with the time and skill these tasks required . . .

after MacRegen raised sufficient investment capital." (Id. ¶¶ 18, 20.) "[T]hese

continued representations . . . motivated Dr. Burnette to continue performing

services for more than 4 years." (Id. ¶ 21.) However, MacRegen did not

compensate Burnette for his work on these assignments. (Id. ¶ 18.) Instead, when

he was terminated on December 21, 2018, MacRegen paid him 150,000 shares of

its common stock. (Id. ¶¶ 19, 30.)

Burnette claims that MacRegen breached its agreements to pay him for the

completion of additional assignments (Count I – Breach of Contract); in the

alternative, Burnette performed these additional services, from which MacRegen

derived substantial benefit, in the absence of a contract and expected to be

compensated (Count II – Quantum Meruit); Burnette justifiably relied on

representations by MacRegen that he would be compensated and was induced to

enter the Consulting Agreement and provide additional services (Count III –

Negligent Misrepresentation); MacRegen knowingly made false statements about

compensating Burnette to induce him to enter the Consulting Agreement and

provide additional services (Count IV – Fraudulent Misrepresentation). MacRegen

has moved to dismiss each of these claims.

II.

To survive a motion to dismiss made pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure, a complaint "must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"
Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v.
Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the
plaintiff pleads factual content that allows the court to draw the reasonable
inference that the defendant is liable for the misconduct alleged." Id. (citing
Twombly, 550 U.S. at 556); see also McCleary-Evans v. Md. Dep't of Transp.,
State Highway Admin., 780 F.3d 582, 585 (4th Cir. 2015) (noting that a
complaint must "contain[] sufficient factual matter, accepted as true, to state a
claim to relief that is plausible on its face in the sense that the complaint's factual
allegations must allow a court to draw the reasonable inference that the defendant
is liable for the misconduct alleged").  However, when a complaint states facts
that are "'merely consistent with' a defendant's liability, it 'stops short of the line
between possibility and plausibility of 'entitlement to relief.''" Iqbal, 556 U.S. at
678 (quoting Twombly, 550 U.S. at 557).  When evaluating whether the complaint
states a claim that is plausible on its face, the facts are construed in the light most
favorable to the plaintiff and all reasonable inferences are drawn in his favor. U.S.
ex rel. Oberg v. Pa. Higher Educ. Assistance Agency, 745 F.3d 131, 136 (4th Cir.
2014).  Nevertheless, "labels and conclusions[,]" "a formulaic recitation of the
elements of a cause of action[,]" and "naked assertions . . . without some further
factual enhancement" are insufficient. Twombly, 550 U.S. at 557.  In other words,
"[f]actual allegations must be enough to raise a right to relief above the speculative
level". Id. at 555.  Finally, a court can consider documents "attached to the

complaint as exhibits." <u>Goines v. Valley Cmty. Servs. Bd.</u>, 822 F.3d 159, 166 (4th Cir. 2016) (citing Fed. R. Civ. P. 10(c)).

A.

As an initial matter, it must be determined which state's laws apply to each of these claims. A federal court with diversity jurisdiction applies the forum state's choice-of-law rules. <u>See</u> <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496 (1941). North Carolina courts hold "that where parties to a contract have agreed that a given jurisdiction's substantive law shall govern the interpretation of the contract, such a contractual provision will be given effect." <u>Tanglewood Land Co., Inc. v. Byrd</u>, 261 S.E.2d 655, 656 (N.C. 1980). However, "[t]he law of the state chosen" will not apply if "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice" or if the "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of applicable law in the absence of an effective choice of law by the parties." <u>Cable Tel Servs., Inc. v. Overland Contracting, Inc.</u>, 574 S.E.2d 31, 33-34 (N.C. Ct. App. 2002) (quoting Restatement (Second) of Conflict of Laws § 187 (1971)).

Here, the Consulting Agreement provides that it "shall be governed in all respects by the laws of the United States of America and by the laws of the State of Delaware, without giving effect to any conflicts of laws principles that require

5

application of the law of a different jurisdiction." (Ex. A to Compl. [Doc. #1-1].)

Accordingly, the parties agree that Delaware law applies to the breach of contract

claim. (Mem. in Supp. at 5-6; Def.'s Mem. of Law in Opp'n to Pl.'s Mot. to

Dismiss ("Mem. in Opp'n") at 5 [Doc. #29].)  And, they had a reasonable basis for

selecting Delaware because MacRegen is incorporated there, and there is no

indication that applying Delaware law would offend North Carolina public policy.

See, e.g., Com. Credit Grp., Inc. v. Falcon Equip., LLC, No. 3:09cv376-DSX, 2010

WL 144101, at *4 (W.D.N.C. Jan. 8, 2010) (finding that parties to a promissory

note had a reasonable basis for choosing Delaware law because the plaintiff is a

Delaware corporation and application of Delaware law did not violate North

Carolina public policy).

MacRegen argues that the contractual choice-of-law provision referencing

Delaware law should also apply to the quantum meruit claim. (Mem. in Supp. at 6

(citing cases with no contractual choice-of-law provision that applied contract

choice of law principles to quantum meruit claims).)  Burnette disagrees, contends

that the Consulting Agreement's choice of law is "irrelevant" to the quantum

meruit claim, and believes that North Carolina law should apply.[1]  (Mem. in Opp'n

at 5-7 (arguing that North Carolina law applies under both lex loci contractus and

---

[1] In a footnote, he suggests that Alabama law may possibly apply because MacRegen is based there, (Mem. in Opp'n at 6 n.1; Compl. ¶ 2), but he does not expound on its application because he believes North Carolina law applies.  In its reply, MacRegen responds to Burnette's footnote by analyzing the quantum meruit claim under Alabama law and concludes that it leads to the same result. (Pl.'s Reply to Def.'s Opp'n to Pl.'s Mot. to Dismiss ("Reply") at 3-4 [Doc. #30].)

lex loci delicti).)  Nevertheless, both parties agree that application of either

Delaware or North Carolina law leads to the same result, although they disagree on

the result. (Mem. in Supp. at 5; Mem. in Opp'n at 8.)  Therefore, the sufficiency of

the quantum meruit claim will be analyzed under both Delaware and North Carolina

law.

As for the tort claims, MacRegen recognizes that some courts have found a

contractual choice-of-law provision broad enough to cover tort claims, while other

courts have not. (Mem. in Supp. at 6-7 (comparing Volvo Grp. N. Am., LLC v.

Forja de Monterrey S.A. de C.V., No. 1:16CV114, 2019 WL 4919632 (M.D.N.C.

Oct. 4, 2019) with P&L Dev., LLC v. Bionpharma, Inc., 367 F. Supp. 3d 421

(M.D.N.C. 2019).)  MacRegen provides the elements and pleading standard for

each claim under Delaware and North Carolina law and argues that the result is the

same under either state's laws, but concludes that North Carolina law likely

applies. (Mem. in Supp. at 6-8, 14, 18-20.)  Burnette is convinced North Carolina

applies, (Mem. in Opp'n at 7-8), but elsewhere states that he "has adequately pled

his claims whether applying North Carolina or Delaware law", (id. at 8).  As above,

it is not necessary to resolve this issue because the application of Delaware and

North Carolina law leads to the same result.

B.

To state a claim for breach of contract under Delaware law, a plaintiff must

allege "first, the existence of a contract, whether express or implied; second,

breach of an obligation imposed by that contract; and third, the resultant damage

to the plaintiff." <u>VLIW Tech., LLC v. Hewlett-Packard Co.</u>, 840 A.2d 606, 612

(Del. 2003). "Contracts must be construed as a whole, to give effect to the

intentions of the parties", and "[w]here the contract language is clear and

unambiguous, the parties' intent is ascertained by giving the language its ordinary

and usual meaning." <u>Nw. Nat'l Ins. Co. v. Esmark, Inc.</u>, 672 A.2d 41, 43 (Del.

1996).

The issue here is whether Burnette has sufficiently alleged a breach of a

contractual obligation. He alleges that he "performed the services under the initial

project assignment" for which he was compensated as promised with 150,000

common shares. (Countercls. ¶¶ 15, 30.) However, he also alleges that after he

completed those initial services, MacRegen representatives solicited his services

and told him that "with each new task and assignment, he would be

compensated" after "MacRegen raised sufficient investment capital." (<u>Id.</u> ¶ 20.)

However, once the capital was raised, MacRegen terminated "its relationship with

him." (<u>Id.</u> ¶ 28.) None of these subsequent assignments and their promised

compensation were reduced to writing. (<u>Id.</u> ¶ 18.)

MacRegen argues first that the services Burnette describes as part of

additional assignments "fall within the scope of the non-limited examples of

'Services' provided in the [Consulting Agreement]" for which MacRegen "fully and

contractually compensated Burnette with 150,000 shares of MacRegen's common

stock." (Mem. in Supp. at 9.) MacRegen also challenges the existence of any

further contractual obligation because Burnette alleged that none of the subsequent

project assignments were in writing, yet the Consulting Agreement required modifications to be in writing. (Id. at 10.)  MacRegen also contends that Burnette has failed to state any damages he suffered. (Id.)

On the other hand, Burnette argues that he "expressly alleges that he significantly exceeded the services identified in the initial project assignment attached to the Consulting Agreement" and was not compensated for these additional services. (Mem. in Opp'n at 9.)  He also responds that the Consulting Agreement "contemplated" additional project assignments, so the oral agreements for subsequent assignments were not modifications that had to be in writing. (Id.)  In a final effort to avoid dismissal, he argues that "MacRegen's argument in favor of dismissal serves to demonstrate the unresolved issues surrounding the intent of the parties, the interpretation of the Consulting Agreement, and the scope and performance of the Consulting Agreement's obligations" that "prevent dismissal of the breach of contract claim at this stage." (Id. at 11.)

Burnette allegedly provided the following services, presumably pursuant to subsequent project assignments: "developed business plans, created and revised executive summaries and presentations for prospective investors, reviewed scientific research and data, devised research and development strategy, evaluated scientific agreements and patents, conducted business and scientific meetings, and provided guidance and oversight for MacRegen's executives" while he assisted MacRegen "in raising investment capital."  (Countercls. ¶¶ 16, 27.)

But, the Project Assignment provides that MacRegen "may from time to time

request" Burnette to "render such services . . . including, without limiting the generality of the foregoing:"

> Advise CEO and Board on scientific and business matters impacting all aspects of the business to ensure Company leverages opportunities through the development of strategic commercial analysis and plan, development of target product profiles, and build business case for potential exits, including but not limited to strategic business alliances, M & A, and IPO[.]

The services Burnette alleges were separate and apart from these are not. They are among the services he was to provide under the Project Assignment, and he admits that he was compensated for those services.

To the extent that Burnette alleges the services described in the initial Project Assignment "merely reflected work that he had already done", the language of the Consulting Agreement and the Project Assignment belie that conclusion. Both use the future tense when describing Burnette's obligation, rather than language that reflects past services already completed. (See, e.g., Consulting Agreement ¶ 1 ("Consultant will render the services set forth on Exhibit A . . . " and "will provide, at Consultant's own expense, a place of work and all equipment . . ."); Project Assignment ("Consultant shall render such services as Client may from time to time request . . .") (emphasis added).) In sum, Burnette has not sufficiently alleged a breach of contract.

Even had he alleged the provision of additional services pursuant to subsequent oral project assignments, the Consulting Agreement requires the project assignments to be in writing. Burnette disagrees and relies on language in

the Agreement "that in the event of any conflict between the terms of this Agreement and any Project Assignment, the terms of the applicable Project Assignment will control." (Mem. in Opp'n at 9 (quoting Consulting Agreement ¶ 15 (emphasis added by Burnette)).)  That entire provision states:

> This Agreement constitutes the entire agreement between the parties relating to this subject matter and supersedes all prior or contemporaneous oral or written agreements concerning such subject matter.  The terms of this Agreement will govern all services undertaken by Consultant for Client; provided, however, that in the event of any conflict between the terms of this Agreement and any Project Assignment, the terms of the applicable Project Assignment will control.  This Agreement may only be changed or amended by mutual agreement of authorized representatives of the parties in writing.

(Consulting Agreement ¶ 15.)  Reading this contractual provision as part of the whole Consulting Agreement teaches that the Project Assignments needed to be in writing.  Burnette alleges and admits they were not.  For this reason, as well, Burnette has not stated a claim for breach of contract.

## C.

Delaware law permits recovery under quantum meruit if "(i) the party performed the services with the expectation that the recipient would pay for them; and (ii) the recipient should have known that the party expected to be paid." Petrosky v. Peterson, 859 A.2d 77, 79 (Del. 2004); see also Owens v. Connections Cmty. Support Programs, Inc., 840 F. Supp. 2d 791, 797 (D. Del. 2012) (listing the "essential elements" as "(1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation or realization of the benefit by the

defendant; (3) and acceptance and retention by the defendant of such benefit under such circumstances that it would be inequitable to retain it without paying the value thereof"). However, "[w]hen there is an enforceable contract between the parties, quantum meruit recovery is inapplicable." Murphy v. Pentwater Cap. Mgmt. LP, No. N16C-12-433 WCC CCLD, 2019 WL 3545850, at *4 (Del. Super. Ct. July 24, 2019) (internal quotations and citation omitted). Therefore, "[c]ourts generally dismiss claims for quantum meruit on the pleadings when it is clear from the face of the complaint that there exists an express contract that controls." Albert v. Alex. Brown Mgmt. Servs., Inc., Nos. 762-N, 763-N, 2005 WL 2130607, at *8 (Del. Ch. Aug. 26, 2005). Cf. Kuroda v. SPJS Holdings, L.L.C., 971 A.2d 872, 891 (Del. Ch. 2009) (explaining that a claim for unjust enrichment "is not available if there is a contract that governs the relationship between parties that gives rise to the unjust enrichment claim" and "when the complaint alleges an express, enforceable contract that controls the parties' relationship . . . a claim for unjust enrichment will be dismissed").

Similarly in North Carolina, a claim for quantum meruit requires a plaintiff to allege "that (1) services were rendered to the defendant; (2) the services were knowingly and voluntarily accepted; and (3) the services were not given gratuitously" and "both parties understood the services were rendered with the expectation of payment." Wing v. Town of Landis, 599 S.E.2d 431, 433 (N.C. Ct. App. 2004). However, when an express contract covers the same subject matter, a plaintiff cannot recover in quantum meruit. Catoe v. Helms Constr. & Concrete

12

Co., 372 S.E.2d 331, 335 (N.C. Ct App. 1988); see also TSC Rsch., LLC v. Bayer Chems. Corp., 552 F. Supp. 2d 534, 540 (M.D.N.C. 2008) (adopting recommendation explaining that "a claim for quantum meruit can only exist in the absence of an enforceable, express contract").

Here, the parties agree on the substantive law on quantum meruit. (Mem. in Supp. at 11-13; Mem. in Opp'n at 11-13.) But, they disagree whether an express contract covers the additional services Burnette alleges he performed. MacRegen argues, as it did above, that these services are among those described in the Project Assignment. (Mem. in Supp. at 12.) Burnette contends, though, that no express contract addresses this additional work. (Mem. in Opp'n at 12-13.)

The earlier determination of Burnette's breach of contract claim resolves this dispute. The additional services Burnette alleges he provided are among those that he obligated himself to perform as part of the Consulting Agreement and its incorporated Project Assignment, the enforceability of which neither party disputes. And, Burnette admits that MacRegen compensated him for his services under the Project Assignment in the form of 150,000 shares of its common stock. Therefore, because an express contract exists that covers the same subject matter as Burnette's quantum meruit claim, this claim is dismissed.

D.

Finally, both parties agree that Rule 9(b) of the Federal Rules of Civil Procedure applies to Burnette's claims of negligent misrepresentation and fraudulent misrepresentation. (Mem. in Supp. at 4, 17-19; Mem. in Opp'n at 15.)

13

Delaware and North Carolina state and federal courts have applied Rule 9(b) to claims of negligent misrepresentation, in addition to fraud. See King v. Pratt & Whitney Can. Corp., No. 20-359-LPS-CJB, 2021 WL 663059, at *3-4 (D. Del. Feb. 19, 2021) (applying Rule 9(b) when a negligent misrepresentation claim is pleaded "in a manner that nevertheless sounds in fraud"); Packrite, LLC v. Graphic Packaging Int'l, Inc., No. 1:17CV1019, 2018 WL 4112827, at *6 (M.D.N.C. Aug. 29, 2018) (explaining that under North Carolina law, a negligent misrepresentation claim "is primarily a fraud-based claim, . . . premised upon the making of a false assertion of a material fact" and applying Rule 9(b) to the claim) (citations omitted); Topshelf Mgmt., Inc. v. Campbell-Ewald Co., 117 F. Supp. 3d 722, 727-28 (M.D.N.C. 2015) ("Federal courts have repeatedly found that the North Carolina tort of negligent misrepresentation sounds in fraud and have applied Rule 9(b) to it."); Otto Candies, LLC v. KPMG LLP, No. 2018-0435-MTZ, 2019 WL 994050, at *7 (Del. Ch. Feb. 28, 2019) ("Delaware courts routinely apply the more stringent Rule 9(b) standard to negligent misrepresentation claims".); Beam v. Sunset Fin. Servs., Inc., No. 18 CVS 2925, 2019 WL 4182491, at *7 (N.C. Bus. Ct. Sept. 3, 2019) ("[A] claim for negligent misrepresentation, just like a claim for fraud, must be pled with particularity pursuant to Rule 9(b)."). But see Topshelf Mgmt., Inc., 117 F. Supp. 3d at 727 n.2 (noting several federal courts in North Carolina that have applied Rule 8 to negligent misrepresentation in the wake of Baltimore Cty. v. Cigna Healthcare, 238 F. App'x 914 (4th Cir. 2007)); Lincoln Nat'l Life Ins. Co. v. Snyder, 722 F. Supp. 2d 546, 561 (D. Del. 2010) (quoting In re Fruehauf Trailer

Copr., 250 B.R. 168, 197 (D. Del. 2000), for the proposition that "the Rule 9(b)

heightened pleading requirement generally does not apply to the state law claims

of . . . negligent misrepresentation").

The Rule 9(b) pleading standard is summarized well in Humana, Inc. v.

Ameritox, LLC, 267 F. Supp. 3d 669, 676-77 (M.D.N.C. 2017):

> Federal Rule of Civil Procedure 9(b) requires a plaintiff making an
> allegation of fraud to "state with particularity the circumstances
> constituting fraud." This heightened pleading standard requires the
> plaintiff to specifically allege "the time, place, and contents of the
> false representations, as well as the identity of the person making the
> misrepresentation and what he obtained thereby." Harrison v.
> Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir.
> 1999); see also Cozzarelli v. Inspire Pharm. Inc., 549 F.3d 618, 629
> (4th Cir. 2008). The Fourth Circuit has cautioned, however, that the
> court should not lose sight of the four purposes of this heightened
> pleading standard: to give sufficient notice of the claim to permit a
> defendant to formulate a defense; to protect against frivolous suits; to
> eliminate suits where all the fraud facts are learned after discovery;
> and to protect defendants from harm of their goodwill and reputation.
> Harrison, 176 F.3d at 784. Consequently, "[a] court should hesitate
> to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that
> the defendant has been made aware of the particular circumstances
> for which [it] will have to prepare a defense at trial, and (2) that
> plaintiff has substantial prediscovery evidence of those facts." Id.

1.

To state a claim for negligent misrepresentation under Delaware law, a

plaintiff must allege "(1) the existence of a pecuniary duty to provide accurate

information; (2) the supplying of false information; (3) that the defendant failed to

exercise reasonable care in obtaining or communicating the information; and (4)

that the plaintiff suffered a pecuniary loss caused by reliance upon the false

information." Kuhn Const. Co. v. Ocean & Coastal Consultants, Inc., 844 F. Supp.

2d 519, 525 (D. Del. 2012).  A pecuniary duty "arises when the parties are in a

business relationship, from which they expect pecuniary benefits."  Id.  The

Delaware Court of Chancery explained this duty as follows:

> The pecuniary duty requirement limits the reach of the negligent
> misrepresentation doctrine by making that doctrine only applicable in
> situations where the defendant makes a "representation in the course
> of a business or a transaction in which the defendant has a pecuniary
> interest."  In situations where the defendant information provider
> expects to profit from the course of conduct in which he provides the
> information, he can reasonably be expected to take reasonable care in
> providing that information.  Likewise, imposing a duty of reasonable
> care on such an information provider is unlikely to discourage the
> information provider from supplying the information because he has
> economic incentive to do so.  Thus, it makes sense that a bank has a
> pecuniary duty to provide accurate information to its account holders.
> From this, one can discern that the purpose of the pecuniary duty
> requirement is to shield those who gratuitously provide information
> from liability under the negligent misrepresentation doctrine.

Corp. Prop. Assocs. 14 Inc. v. CHR Holding Corp., No. 3231-VCS, 2008 WL

963048, at *9 (Del. Ch. Apr. 10, 2008) (internal citations omitted).

In North Carolina, a claim for negligent misrepresentation requires that a

plaintiff justifiably rely "to his detriment on information prepared without

reasonable care by one who owed the relying party a duty of care."  Raritan River

Steel Co. v. Cherry Bekaert & Holland, 367 S.E.2d 609, 612 (N.C. 1988).

Circumstances determine whether a duty of care is owed and, if so, what that

duty is.  For example, "within professional relationships" like those with real estate

appraisers, engineers, architects, and accountants, the duty in Restatement

(Second) Torts § 552 "commonly arises".  Rountree v. Chowan Cty., 796 S.E.2d

827, 831-32 (N.C. Ct. App. 2017) (also noting that "in a more limited context, . . .

16

a separate duty of care may arise between adversaries in a commercial transaction"). This is because North Carolina courts hold "that the action lies where <u>pecuniary loss</u> results from the supplying of false information to others for the purpose of guiding them in their business transactions." <u>Driver v. Burlington Aviation, Inc.</u>, 430 S.E.2d 476, 480-81 (N.C. Ct. App. 1993) (citing Restatement (Second) of Torts § 552 and cases involving accountants, engineers, real estate appraiser, architects, and attorneys). Section 552(1) explains that

> [o]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating that information.

<u>See also</u> Restatement (Second) Torts § 552 cmt. a ("[O]ne who relies upon information in connection with a commercial transaction may reasonably expect to hold the maker to a duty of care only in circumstances in which the maker was manifestly aware of the use to which the information was to be put and intended to supply it for that purpose.").

The Restatement of Employment Law also notes that § 552 of the Restatement (Second) Torts "applies to employers who supply false information to influence current or prospective employees to enter into or maintain an employment relationship with the employer, a relationship in which employers have a pecuniary interest." Restatement of Employment Law § 6.06, reporters' n., cmt. a (2015). MacRegen claims § 552's "duty has not . . . been held to extend to an

arm's length employment agreement". (Mem. in Supp. at 16 (citing <u>Rountree</u>, 796 S.E.2d at 832).)  While that may be true, the circumstances in <u>Rountree</u> differ from those here.  There, in addition to the "potentially adversarial arm's-length negotiation between an employer and prospective employee", the "[d]efendant did not have exclusive access or control over the . . . information, which was publicly available and readily accessible" and the "plaintiff had an equal opportunity to perform his own investigation". 796 S.E.2d at 832.  However, when faced with a negligent misrepresentation claim by an employee against his employers when they allegedly failed to pay him as promised in various contracts, the North Carolina Business Court held that the plaintiff "demonstrate[d] no basis to impose a duty on any Defendant arising from the negotiations for the employment relationship." <u>Gupta v. Eli Global, LLC</u>, No. 18 CVS 500057, 2019 WL 2579911, at *8 (N.C. Bus. Ct. June 19, 2019).

MacRegen argues that it owed no duty to Burnette and otherwise challenges the sufficiency of the allegations.  It relies on the Restatement (Second) of Torts § 552 to argue that, under North Carolina law[2], Burnette has not pled a duty of care because that duty does not extend to these circumstances. (Mem. in Supp. at 15-16; <u>see also</u> Reply at 9.)  Burnette does not address MacRegen's contention that he has not alleged a duty under § 552.  Instead, he argues that the duty "is clear from the attendant circumstances" because of the specialized nature of the

_____

[2] Neither MacRegen nor Burnette analyze whether Burnette has alleged a duty under Delaware law.

services he provided MacRegen. (Mem. in Opp'n at 14; <u>see also</u> Countercls. ¶ 53 (alleging MacRegen "owed him a duty of care" "as a company employing the skilled services of Dr. Burnette").)  However, the case law he cites does not a support a duty on the part of MacRegen created by Burnette's provision of specialized or skilled services.

It is not necessary to determine if MacRegen owed Burnette a duty for purposes of a negligent misrepresentation claim because the sufficiency of the allegations falls short.  As noted above, the parties agree that Rule 9(b) applies to this claim.  And, the case law supports its application because Burnette's allegations of negligent misrepresentation sound in fraud.  He alleges that he "was always assured that he would be adequately compensated", he "was told by representatives of MacRegen that, with each new task and assignment, he would be compensated", "it was represented that [his] compensation would be paid after MacRegen raised sufficient capital", "[i]t was these continued representations that motivated [him] to continue performing services for more than 4 years", "MacRegen knowingly and intentionally decided not to fully compensate [him] despite representations that it would", and "MacRegen . . . allow[ed] these misrepresentations to perpetuate to obtain" Burnette's services. (Countercls. ¶¶ 19-21, 25-26.)

Even if the content of these representations were particularly alleged, Burnette has not alleged who made them and when they were made over the course of a four-year period.  Burnette argues that "any lack of particularity about

the nature of the misrepresentations is a product of the subject matter, not of [his] pleadings" because the date of the "acquisition of investment capital . . . was not known by either party until it occurred." (Mem. in Opp'n at 15.)  However, Burnette alleges that he was the recipient of these representations; therefore, he would know what was said by whom and when, regardless of what time in the future MacRegen would acquire investment capital.  Although the passage of time may cloud specific details from memory, Burnette has not attempted to allege any identifying information.

He also argues that it is sufficient to allege that an entity as opposed to individuals made a statement and that the law does not require him to allege the full name of the individuals who made these representations or the exact date and time they were made. (Mem. in Opp'n at 15-16 (citing Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999) & Nahigian v. Juno Loudoun, LLC, 684 F. Supp. 2d 731, 738 (E.D. Va. 2010)[3]).)  However, it is not apparent that anything on the cited page in Harrison, involving the False Claims Act, supports Burnette's position.  Elsewhere in the opinion, the sufficiency of the allegations about who made the representation is either not at issue or, where it is, the court affirmed the district court's dismissal of several counts where the

---

[3] The Nahigian court found sufficient the plaintiff's allegation that a company's representative made the misrepresentation because "after reviewing the specific allegations and listening to argument on the issue, . . . the Defendants are amply aware of the 'particular circumstances for which [they] will have to prepare a defense' . . . ." 684 F. Supp. 2d at 738-39.  The same cannot be said of Burnette's allegations.

plaintiff did not state who perpetrated the fraud. See, e.g., Harrison, 176 F.3d at

789. And, accepting for the sake of argument that Burnette need not allege the

full name of the speaker or the exact date and time the statements were made, he

fails to realize that he has not alleged any identifying information, a shortcoming

that requires dismissal. See Dineen v. Pella Corp., Nos. 2:14-mn-00001-DCN,

2:14-cv-03479-DCN, 2015 WL 6688040, at *10 (D.S.C. Oct. 30, 2015) (finding

affirmative negligent misrepresentations not sufficiently specific where "the

complaint does not indicate which Pella employee or document supplied the

misrepresentations" and "there is no indication of the time or place where such

misrepresentations were made"); Smithfield Bus. Park, LLC v. SLR Int'l Corp., No.

5:12-CV-282-F, 2014 WL 3738217, at *5 (E.D.N.C. July 29, 2014) ("Simply

stating the misrepresentation occurred sometime between October 2008 and

February 2009 is not sufficiently specific . . . .").

In sum, Burnette's allegations do not make MacRegen "aware of the

particular circumstances for which [it] will have to prepare a defense at trial",

Harrison, 176 F.3d at 784. Compare Countercls. ¶¶ 7-69 with Smith v.

Clark/Smoot/Russell, 796 F.3d 424, 432-33 (4th Cir. 2015) (finding, in a False

Claims Act action, that the plaintiff sufficiently alleged "the 'who, what, when,

where and how of the alleged fraud" in "his long and detailed complaint") and

Jones v. BMW of N. Am., LLC, No. 1:20-cv-00057, 2020 WL 5752808, at *8

(M.D.N.C. Sept. 25, 2020) (determining that the plaintiff "made sufficient

allegations regarding BMW's actions, and the actions of its agents, such that the

21

'who' requirement of Rule 9(b) is satisfied" although he did not identify "a specific natural person who failed to make the required disclosures"). <u>See also</u> <u>Breeden v. Richmond Cmty. Coll.</u>, 171 F.R.D. 189, 196 (M.D.N.C. 1997) (finding that a "general averment" and "[t]he uncertainty of the time and place of these alleged omissions make[] it difficult, if not impossible, for defendants to specifically address this allegation").[4]  Therefore, Burnette's claim for negligent misrepresentation is dismissed.

2.

To state a claim for fraudulent misrepresentation under Delaware law, a plaintiff must sufficiently allege

> (1) false representation (usually one of fact); (2) that defendant knew or believed the representation was false; (3) that the false representation was intended to induce the plaintiff to act or refrain from acting; (4) that the plaintiff's action or inaction was taken in justifiable reliance upon the representation; and (5) plaintiff was damaged by such reliance.

<u>J.C. Trading Ltd. v. Wal-Mart Stores, Inc.</u>, 947 F. Supp. 2d 449, 458 (D. Del. 2013) (citing <u>Carrow v. Arnold</u>, No. 192-K, 2006 WL 3289582, at *8 (Del. Ch. Oct. 31, 2006), <u>aff'd</u>, 933 A.2d 1249 (Del. 2007)).  "Generally, . . . statements of future intent do not constitute 'false representation[s] of fact' that would satisfy

---

[4] Although the federal pleading standard applies here, Burnette's allegations would also not satisfy the North Carolina pleading standard. <u>See</u> <u>Coley v. N.C. Nat'l Bank</u>, 254 S.E.2d 217, 220 (N.C. Ct. App 1979) ("It would be manifestly unfair to require a corporation to attempt to defend an action for fraud without being informed as to which of its officers, agents, or employees purportedly made the misrepresentations, as well as to all the facts and circumstances surrounding the transaction.").

22

the first element of fraudulent misrepresentation" unless "the Complaint alleges particularized facts that allow the Court to infer that, at the time the promise was made, the speaker had no intention of keeping it." MicroStrategy Inc. v. Acacia Rsch. Corp., No. 5735-VCP, 2010 WL 5550455, at *15 (Del. Ch. Dec. 30, 2010).[5]

Under North Carolina law, a claim for fraudulent misrepresentation requires "[a] (i) false representation or concealment of a material fact, (ii) reasonably calculated to deceive, (iii) made with intent to deceive, (iv) which does in fact deceive, (v) resulting in damage to the injured party." Taylor v. Gore, 588 S.E.2d 51, 54 (N.C. Ct. App. 2003). And, both parties agree that, under these alleged circumstances, Burnette must allege that MacRegen did not intend to comply with its promise at the time it made the promise. (Mem. in Supp. at 20-21 (citing Jenkins v. AKZO Noble Coatings, Inc. 35 F. App'x 79, 86 (4th Cir. 2002) & Hudgins v. Wagoner, 694 S.E.2d 436, 445 (N.C. Ct. App. 2010)); Mem. in Opp'n at 17 (citing Bon Aqua Int'l, Inc. v. Second Earth, Inc., No. 1:10CV169, 2013 WL 357469, at *11 (M.D.N.C. Jan. 29, 2013), recommendation adopted, Order (Feb. 26, 2013).) Indeed, "where a fraud claim stems from an alleged failure to fulfill an agreement, the complaint must contain specific factual matter to permit the plausible inference that the defendant did not intend to honor the agreement at the time it was made." Packrite, LLC v. Graphic Packaging Int'l, Inc., No.

_____

[5] The parties agree on this point but omit any reference to Delaware law.

1:17CV1019, 2019 WL 2992340, at *4 (M.D.N.C. July 9, 2019) (quoting Bon Aqua Int'l, Inc., 2013 WL 357469).

MacRegen challenges the sufficiency of Burnette's allegations and argues that he has "allege[d] facts that actually defeat the claim." Burnette relies on the same arguments he made in support of the sufficiency of his negligent misrepresentation claim – that "MacRegen representatives" "continuously" told him that he would be compensated for his work. (Mem. in Opp'n at 17.) In addition to the allegations previously described in support of Burnette's negligent misrepresentation claim, he alleges that "[a]t the time [he] agreed to commence services for MacRegen and at several points thereafter, MacRegen made several knowingly false statements regarding compensation that would be paid to [him]", "[t]hese statements were designed to deceive [him] such that he would be induced to lend his experience and reputation to MacRegen without receiving commensurate compensation", and he "was, in fact, deceived". (Countercls. ¶¶ 62-64.)

Burnette has not alleged "specific factual matter to permit the plausible inference that [MacRegen] did not intend to honor the agreement at the time it was made", Packrite, 2019 WL 2992340, at *4; see also MicroStrategy Inc., 2010 WL 5550455, at *15. Furthermore, these allegations are insufficient for the same reasons those in support of negligent misrepresentation fall short, and Burnette's arguments are as unavailing here as they were earlier. He has not attempted to allege any identifying information such as who said what when. As a result, he

has not made MacRegen "aware of the particular circumstances for which [it] will have to prepare a defense at trial", <u>Harrison</u>, 176 F.3d at 784.[6]  Thus, Burnette's claim for fraudulent misrepresentation is dismissed.[7]

III.

For the reasons stated above, IT IS HEREBY ORDERED that Plaintiff MacRegen, Inc.'s Motion to Dismiss Defendant's Counterclaims [Doc. #24] is GRANTED.

This the 30th day of June, 2021.

/s/ N. Carlton Tilley, Jr.<br>Senior United States District Judge

---

[6] Because Burnette's allegations fall short of the Rule 9(b) standard, it is unnecessary to address MacRegen's other argument for dismissal of this claim – that Burnette alleged facts that defeat his claim.

[7] Because both tort claims are dismissed for insufficient pleading, it is unnecessary to address MacRegen's other argument in support of their dismissal – that the economic loss rule bars them.